Filed 8/30/13  P. v. Dixon CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061943 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD236479) |
| TADECE DWAINE DIXON et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Diego County,

Richard S. Whitney, Judge.  Judgments affirmed.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and

Appellant Tadece Dwaine Dixon.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and

Appellant Nickalos Demond Gray.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Laura A. Glennon,

Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Tadece Dwaine Dixon guilty of carjacking and Nickalos Demond Gray (together with Dixon, the defendants) guilty of carjacking and possession of a deadly weapon (metal knuckles). The jury also found true allegations that Dixon personally used a firearm in the commission of the offense and Gray was vicariously liable for the firearm use. The defendants complain the trial court erred in excluding third party culpability evidence and the prosecutor committed prejudicial misconduct by arguing facts not in evidence. Dixon also complains that the trial court erred by instructing the jury with CALCRIM No. 361 regarding a defendant's failure to explain or deny evidence. Lastly, the defendants argue the cumulative effect of the errors requires reversal.

FACTUAL AND PROCEDURAL BACKGROUND

On September 8, 2011, there was a widespread power outage in San Diego. That night, the defendants and Oscar Evans went to Karcamel Ashlock's and Sean Spicer's home in southeast San Diego. Evans recalled that Dixon was wearing a hat, shorts and a blue shirt. The defendants left Ashlock's and Spicer's home together shortly before 10:00 p.m. while Evans stayed behind.

Around 10:30 p.m., Victor Garcia sat in his parked Honda vehicle while he used the vehicle to charge his cell phone. The car was parked in front of Garcia's home, which was approximately half a mile away from Ashlock's and Spicer's home. An African-American man, later identified as Dixon, approached Garcia and told him to give up the car. Dixon revealed a gun and cocked it.

As Garcia got out of his car, Dixon pointed the gun at him and told him to leave the

2

keys in the car. Garcia put his hands up in the air with his cell phone still in one hand and told Dixon he would not give up the phone. Dixon directed Garcia to the sidewalk and told him to lie facing down. Garcia complied but then turned over to look at Dixon and noticed he was wearing a dark colored t-shirt, shorts and a baseball cap with a "L.A." emblem on it. Garcia looked at Dixon for 10 to 15 seconds.

When Garcia was lying on the ground, he heard a second man opening the driver's side door of his car. The second man got into the car and said, "[L]et's roll." Garcia did not see the second man but believed he was African-American based on his "accent." At that point, Dixon put the gun away and got into the passenger side of the car. Garcia saw the car take off and then he called 911.

The police utilized the LoJack recovery system in Garcia's vehicle and located the Honda around 11:16 p.m. in Chula Vista. Officers set up a perimeter around the unoccupied parked vehicle. After the vehicle became occupied, officers followed it and initiated a traffic stop. There were three people in the car when officers stopped it. Gray was driving, Dixon was in the front passenger seat, and Evans was in the backseat.

When Gray pulled the car over, Dixon got out and started running. One of the officers chased Dixon, but then fell down some stairs. That officer recovered a handgun at the top of the stairwell where he had chased Dixon. Other officers located Dixon and detained him. When he was taken into custody, Dixon was wearing a dark colored shirt, baseball cap and shorts.

An officer transported Garcia to Chula Vista to identify the suspects. During a

3

curbside lineup, Garcia identified Dixon as the person who pointed a gun at him.  Garcia also told officers that Dixon's hat was the same as the one on the person who carjacked him, but Dixon was wearing it sideways during the lineup instead of straight as it was during the carjacking.  Thus, officers turned Dixon's hat.  Officers also asked Garcia to identify Gray and Evans, but Garcia was unable to do so.

Officers found brass knuckles in Gray's pocket and his backpack in the backseat of the Honda.  Gray told officers he received the keys to the Honda from a person named "L.," who was at the home of Tyra Jones, his child's mother.  Gray claimed "L." was Jones's roommate's brother.  However, Jones testified that on the day of the incident, she did not have a roommate and did not know "L."

*Defense*

Dixon testified on his own behalf.  He stated he did not carjack Garcia.  According to Dixon, he did not leave Ashlock's and Spicer's home with Gray.  Instead, he walked by himself to a liquor store.  When Dixon was leaving the liquor store, he saw Gray in a Honda.  Dixon asked Gray whose car he was driving and Gray responded that it was a friend's car.  Dixon got into the car and the two men returned to Ashlock's and Spicer's home.  Before he got out of the car, Dixon saw a hat that matched his shirt in the backseat.  At some point, Dixon went back to the car and put the hat on.  Dixon stayed at Ashlock's and Spicer's home for approximately 10 to 20 minutes and then left with Gray and Evans to go to Chula Vista.

While they were on the way to Chula Vista, Dixon noticed a gun under his seat and

4

passed it to Evans in the backseat. When Evans returned the gun, Dixon wiped it clean and put it back on the floor. Dixon testified he ran when officers stopped the vehicle because he knew about the gun in the car and that made him nervous.

DISCUSSION

I. *Third Party Culpability Evidence*

A. Background

During trial, Gray's counsel sought to introduce evidence of two incidents a few days after the carjacking where Garcia observed African-American men staring at him near his home. The defendants argued the evidence was relevant to third party culpability. The court held an Evidence Code section 402 hearing with Garcia. (Undesignated statutory references are to the Evidence Code.)

Garcia testified that three days after the carjacking, he was walking his dog near his home when he observed an African-American man walking down his street. The man turned to walk away from Garcia but looked back at him at least 10 times. The man stopped at the end of the street, looked down to the dirt, turned around to stare at Garcia, and then shot what Garcia believed was a firearm into the ground. The man went over a fence and stared at Garcia until Garcia walked back to his house. Garcia thought it was possible that the man was staring because Garcia was also staring at him.

A few days later, Garcia saw the same man walking with another African-American man near Garcia's home. The two African-American men were talking and joking until they saw Garcia. At that point, the men became silent, made eye contact with Garcia, had a brief

5

conversation, and then continued walking. Garcia was worried because his vehicle registration and insurance information with his name and address were still missing.

After considering the evidence and counsels' arguments, the trial court concluded that although it "believe[d] the defense should be able to use just about any and all evidence to support a defense in this case[,]" the proffered evidence was inadmissible because it was speculative and irrelevant.

B. Analysis

The defendants argue the trial court violated their due process rights to a fair trial and to present a complete defense by excluding third party culpability evidence. We reject the defendants' contention.

A defendant has a right to present evidence of third party culpability if that evidence could raise a reasonable doubt about his guilt. (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).) "[E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid.*) Further, "[e]vidence that another person . . . had some 'remote' connection to the victim or crime scene, is not sufficient to raise the requisite reasonable doubt." (*People v. DePriest* (2007) 42 Cal.4th 1, 43.)

The court treats third party culpability evidence "like any other evidence." (*Hall*, *supra*, 41 Cal.3d at p. 834.) The evidence is admissible if relevant (§ 350), unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or

confusion of the jury. (§ 352; *Hall*, at p. 834.) A trial court's determination of whether to admit third party culpability evidence will not be disturbed on appeal absent an abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 372.)

Here, the defendants did not present any direct or circumstantial evidence linking the African-American men Garcia saw a few days after the carjacking to the actual perpetration of the crime. Although Garcia may have felt intimidated by the men, he also stated he was "on edge" after being carjacked and his fear does not connect the men to the crime. Moreover, the fact that the African-American men were in Garcia's neighborhood, looked at him multiple times, and possibly had a gun does not link them to the carjacking. The men did not approach Garcia or say anything to him. The evidence was speculative and any connection to the crime was too tenuous to raise a reasonable doubt about the defendants' guilt.

In light of our conclusion that the trial court did not abuse its discretion in determining that the proffered evidence was irrelevant, it necessarily follows that the court did not violate the defendants' constitutional rights by excluding the evidence. (See *People v. Babbitt* (1988) 45 Cal.3d 660, 685 ["because defendant's evidence failed to meet the threshold requirement of relevance, its exclusion pursuant to section 352 did not implicate any due process concerns"]; accord *People v. Adams* (2004) 115 Cal.App.4th 243, 254 [rejecting claim that exclusion of "totally irrelevant" third party culpability evidence violated defendant's constitutional right to due process and constitutional right to present a defense].)

7

## II. *Alleged Prosecutorial Misconduct*

The defendants argue the prosecutor committed nine instances of prejudicial misconduct during closing argument by arguing facts not in evidence.

A. General Legal Principles

Prosecutorial misconduct exists "'under state law only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'" (*People v. Earp* (1999) 20 Cal.4th 826, 858.) Further, a defendant's federal due process rights are violated when prosecutor's improper remarks "'"'infect[] the trial with unfairness,' "'" making it fundamentally unfair. (*Ibid.*) A showing of bad faith on the part of the prosecutor is not required to establish misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 822 (*Hill*).)

"Although prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct." (*Hill*, *supra*, 17 Cal.4th at p. 823.) Additionally, "'statements of facts not in evidence by the prosecuting attorney in [her] argument to the jury constitute misconduct.'" (*People v. Adcox* (1988) 47 Cal.3d 207, 236.)

To preserve a claim of prosecutorial misconduct, a defendant must timely object and request a curative admonition unless an admonition would not have cured the harm caused by the misconduct. (*People v. Hinton* (2006) 37 Cal.4th 839, 863; *People v. Earp*, *supra*, 20 Cal.4th at p. 858.) Therefore, to avoid forfeiture of a claim of prosecutorial misconduct, a defendant generally "must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury." (*People v. Brown* (2003) 31 Cal.4th 518, 553.)

Further, "in the absence of prejudice to the fairness of a trial, prosecutor misconduct will not trigger reversal." (*People v. Bolton* (1979) 23 Cal.3d 208, 214.) " '[I]n cases where jurors are improperly exposed to certain factual matters, the error is usually tested under the standard set out in *People v. Watson* (1956) 46 Cal.2d 818, 836' . . . ." (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323–1324.)

B.  Prosecutor's Statements

With the foregoing principles in mind, we now turn to a discussion of each of the statements during the prosecutor's closing argument that the defendants contend amount to prosecutorial misconduct.

1. *Prosecutor's Statement about a Black Jacket Found in the Vehicle*

During trial, a detective testified that when the Honda was stopped, he processed the vehicle and collected evidence.  He found a black jacket in the trunk that did not belong to Garcia.  The detective, however, did not inquire as to whether the jacket belonged to any of the three individuals in the car or request a DNA analysis of the jacket.

During closing argument, the prosecutor stated, "How do we know this black jacket doesn't belong to defendant Gray?  He's got all his other property inside the car.  He's got his life inside this backpack, which is in the backseat of [Garcia's] carjacked car.  How do we know this jacket doesn't belong to him too?  He was never asked by Detective Smith.  Defendant Dixon was never asked by Detective Smith.  Again, why?  Because the victim said the guy with the gun was wearing either a blue or black shirt, not a jacket."

Dixon's counsel objected on the basis that the argument misstated the evidence.  The trial court sustained the objection.

9

The defendants argue the prosecutor's statement was prejudicial because the black jacket was not shown to belong to anyone in the car and thus was exculpatory evidence suggesting a third party was involved in the carjacking. The defendants also assert the trial court failed to admonish the jury to consider the evidence rather than counsel's argument. The Attorney General contends any error was cured because the trial court sustained defense counsel's objection and reference to the jacket was harmless because it was irrelevant.

Initially, we note that although defense counsel objected to the prosecutor's statement, the defendants did not request the court admonish the jury. In order to avoid forfeiture, the defendants were required to object and request an admonition. (*People v. Brown*, *supra*, 31 Cal.4th at p. 553.) We nevertheless conclude that to the extent the prosecutor's statement could be considered misconduct, the defendants were not prejudiced by the error.

The court sustained defense counsel's objection and instructed the jury that nothing the attorneys said during closing argument was evidence (CALCRIM No. 222). Moreover, earlier in the prosecutor's closing argument, the trial court sustained another objection based on misstatement of facts and at that point admonished the jury that it must "[k]eep in mind the attorneys are arguing what they believe the evidence has shown. If there's a conflict between the argument and the evidence, you are to rely on the official record to show what the evidence is. And [the court] will instruct you, if need be, you can have the record read back to you during deliberations. It's argument as to what they believe the evidence has

10

shown.  The argument itself is not evidence.  And, again, you always rely on the official record to make a determination what the evidence is."  Under these circumstances, we conclude the defendants were not prejudiced by the prosecutor's statement.

2. *Prosecutor's Statement about the Timing of Events*

The prosecutor argued, "It is not reasonable, it's not a reasonable conclusion, not at all.  That 10 minutes would be enough time for somebody else to take that car from . . . Garcia at gunpoint, go over to . . . Jones'[s] complex, go inside . . . Jones'[s] apartment kicking it with Gray, and Gray happens to get a call my buddy is in Chula Vista, I'm going to go visit him, can I borrow your car?"  Defense counsel objected on the basis that the prosecutor was stating facts not in evidence.  The trial court sustained the objection and informed the jury that "[a]gain, you are going to rely on the evidence, if need be the record, we'll show you what the evidence is."

The defendants contend the prosecutor committed misconduct by arguing their story was unreasonable because it gave the alleged third party carjacker only 10 minutes to take Garcia's car, arrive at Jones's house, and then give the keys to the car to Gray.  The defendants assert the prosecutor distorted the timeline of events because the evidence showed the carjacker had more than 25 minutes.  Although we agree that the prosecutor mischaracterized the evidence, the error was not prejudicial in light of defense counsel's objection, the court's immediate admonition to the jury and the instruction to not consider counsel's argument as evidence (CALCRIM No. 222).

11

### 3. *Prosecutor's Statement about Gray's Accent*

During closing argument, the prosecutor stated, "Defendant Gray has the same accent that the person who aided and abetted the guy with the gun had back on the night of the blackout." Defense counsel objected on the basis that there were not facts in evidence "as to whether the accents are the same." The trial court overruled the objection.

The defendants argue the prosecutor's statement was improper because there was no evidence that Gray's accent was the same as one of the carjackers and there is no authority for the proposition that an "African-American accent" exists. The Attorney General argues there was evidence regarding Gray's "accent."

While the prosecutor's choice of words may not have been ideal, prosecutors have wide latitude to draw inferences from the evidence. (*Hill*, *supra*, 17 Cal.4th at p. 823.) Based on the evidence, it was not unreasonable for the prosecutor to comment on what the prosecutor and witnesses termed an "accent." Garcia testified he believed the second man involved in the carjacking was African-American based on his "accent." Officer Lopez, who searched Gray on the night of the incident, testified that Gray had a "slang-type of accent" that he had heard before in the "African-American community." Officer Lopez clarified, he "wouldn't say specifically an African-American accent, but [Gray's accent] does fall in line with the African-American community that [he] deal[s] with on a regular basis in southeast San Diego."

Based on the foregoing, we conclude the prosecutor did not commit misconduct by commenting on Gray's "African-American accent."

4. *Prosecutor's Statement about Dixon's Hat*

When discussing the hat Dixon claimed he put on after finding it in the vehicle, the prosecutor argued, "[The hat] matches the blue shirt and his white polo shorts. So he just happens to put on the hat, the same hat the victim ID's the carjacker was wearing." Defense counsel objected and the trial court sustained the objection.

The defendants contend the prosecutor committed misconduct by arguing Dixon wore the same hat as the person responsible for the carjacking. However, there was evidence to support the prosecutor's statement. Most notably, Garcia identified the hat Dixon was wearing when he was detained as the same hat worn by the carjacker. In any event, even if the prosecutor's statement was incorrect, the error was cured when the court sustained defense counsel's objection. Although the trial court did not admonish the jury in this instance to not consider the prosecutor's argument as evidence and the defendants did not request such an admonition, the court had previously advised the jury on multiple occasions and instructed the jury with CALCRIM No. 222 in this regard.

5. *Prosecutor's Statement about Jones's Meetings with Investigators*

The prosecutor argued, "If [Jones] knew she had to talk to [the District Attorney Investigator], she wouldn't have talked to him. Again, this is closer to the crime. This is before she's had an opportunity to meet with defense investigators and go over the story. This is before she has an opportunity to hear from the defense investigator, hey why did you meet with the DA investigator?" Defense counsel objected on the basis of facts not in evidence and the court sustained the objection.

13

The defendants argue the prosecutor committed misconduct by implying that the defense investigators improperly tried to influence Jones's testimony. The Attorney General admits there was no evidence that defense investigators asked Jones why she met with the district attorney's investigator, but contends any error was cured when the trial court sustained defense counsel's objection and the prosecutor's statement was not prejudicial.

Preliminarily, we note that it appears from the record that the prosecutor meant Jones would *not* have spoken with the district attorney's investigator if she knew she had no obligation to do so. With this understanding of the prosecutor's statement, we conclude any error was harmless. The trial court sustained defense counsel's objection and although it did not admonish the jury to disregard the prosecutor's statement, it had previously done so based on the same objection and instructed the jury that the prosecutor's argument was not evidence (CALCRIM No. 222). Lastly, we conclude it is not reasonably probable that the jury believed defense investigators attempted to influence Jones to testify untruthfully based on the prosecutor's statement as there was no evidence in that regard and we presume the jury followed the court's instruction to rely on the evidence. (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 36–37.)

6. *Prosecutor's Statement about Ashlock's Testimony*

The prosecutor argued, "Again, [Ashlock] says that . . . [the defendants] leave around 9:58 together. She has no reason to lie and say they left together when they didn't. She said she was outside at the barbeque. She was hanging out, getting the barbeque ready. They were in chairs. I think she was actually on the staircase." Defense counsel objected on the

14

basis of facts not in evidence. The trial court sustained the objection.

The defendants argue there was no evidence that Ashlock was on the staircase and thus the prosecutor misstated the vantage point, if any, from which Ashlock saw the defendants leave her home. We disagree with the defendants' contention. On direct examination, Ashlock testified that the defendants left her home together at 9:58 p.m. When the prosecutor asked what she, Spicer and Evans did at that point, Ashlock responded by stating they were eating and had barbecued in front of her stairway. During cross-examination, Dixon's counsel attempted to clarify Ashlock's testimony about where she was when the defendants left her house:

> "Q    I was curious what you were doing at the time that [the defendants] left at 9:58 p.m.?
>
> "A    I was sitting on the stairs.
>
> "Q    Okay. So you weren't inside preparing the food?
>
> "A    No.
>
> "Q    Okay.
>
> "A    I was . . . Yeah . . ."

Based on the foregoing, there is some evidence that Ashlock may have been on the staircase when the defendants left her home. In any event, we conclude any error was not prejudicial. The alleged misconduct was cured because the court sustained defense counsel's objection, had previously admonished the jury that counsel's arguments were not evidence and provided an instruction to the jury in the same regard.

15

7. *Prosecutor's Statement about the Length of Time Garcia Looked at Dixon*

The prosecutor stated, "The most important thing [Garcia] did do was spend a lot of time looking at defendant Dixon the night of the crime, at least 30 seconds to take a look at him." Defense counsel objected and the trial court sustained the objection.

The Attorney General concedes that there was no evidence that Garcia looked at Dixon for at least 30 seconds. Instead, the evidence showed that Garcia looked at Dixon for 10 to 15 seconds.

We conclude the prosecutor's statement was not prejudicial. Again, the trial court sustained defense counsel's objection. Moreover, Garcia testified he purposely turned to look at Dixon and was able to see Dixon's entire face. On the night of the crime, Garcia identified Dixon as the person who pointed a gun at him. Dixon expressed no doubt about his identification. Based on this evidence, it is not reasonably probable that the defendants would have obtained a more favorable result in the absence of the prosecutor's misstatement.

8. *Prosecutor's Statement about the District Attorney's Efforts to Locate "L."*

The prosecutor argued, "L., no one knows L. There was no way to find L. The District Attorney Investigator tried to locate L." Defense counsel objected, stating the facts were not in evidence. The trial court sustained the objection and reminded the jury to "[k]eep in mind you're going to rely on the evidence not the arguments as to what the evidence is."

The defendants argue there was no evidence to support the prosecutor's statement that the district attorney attempted to locate "L." and, in making that statement, the prosecutor

16

undermined their third party culpability defense. The Attorney General argues the error was cured because the court sustained the defense's objection and admonished the jury.

We agree with the Attorney General. In this instance, the trial court immediately advised the jury that it should rely on the evidence and not counsel's argument. Additionally, the trial court instructed the jury with CALCRIM No. 222, providing that closing arguments are not evidence and the jury should decide the case solely based on the evidence presented at trial. Any harm flowing from the prosecutor's statement was thereby cured.

9. *Prosecutor's Statement about Evans's Testimony*

During closing argument, the prosecutor argued about Evans's testimony concerning Dixon's hat:

> "[Prosecutor]: Evans . . . said, Gray and Dixon left walking together, left together. [Ashlock] said the same thing. . . . Both return in mystery car. Gun still in car. Gun wiped clean by Dixon, but he still flees with it, risking his own life, wearing L.A. hat despite . . . Evans'[s] sworn testimony saying none of his friends would wear an L.A. hat.

> "[Dixon's counsel]: Objection. Facts not in evidence. Misstates the testimony.

> "[The Court]: Overruled.

> "[Prosecutor]: I think he even said he wouldn't let an L.A. hat in his house.

> "[Dixon's counsel]: Objection. Facts not in evidence. Misstates the testimony.

> "[The Court]: Overruled."

17

Although the defendants appear to take issue with the prosecutor's statements concerning what Evans said about the L.A. hat, they fail to explain the basis for their argument. In any event, based on our review of the record, we conclude the prosecutor's statements did not constitute misconduct.

Evans testified that on the day of the crime, Dixon was not wearing a hat with a L.A. emblem on it. In explaining how he knew it was not a L.A. hat, Evans claimed, "We wouldn't wear a L.A. hat. [Dixon is] not from L.A. and neither am I, neither are my friends." Evans went on to state that "[n]o one under [his] roof owned a L.A. hat."

A prosecutor is entitled to make a "'"'fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom'"'" (*Hill*, *supra*, 17 Cal.4th at p. 819) and "to assert [her] interpretation of what the evidence showed" (*People v. Navarette* (2003) 30 Cal.4th 458, 513). It was a fair comment and a reasonable interpretation of the evidence for the prosecutor in this case to argue that Evans stated none of his friends would wear a L.A. hat and he wouldn't allow a L.A. hat in his house. Moreover, even if the prosecutor misstated Evans's testimony, the misstatement did not render the trial unfair.

Although we have concluded that the prosecutor did not commit any prejudicial misconduct in her closing argument, we feel compelled to note that we certainly do not condone her presentation because it involved more than mere inadvertent misstatements of the evidence. Rather, the prosecutor's closing argument misstated the evidence on multiple occasions. We urge the prosecutor to be more accurate and circumspect in her closing argument and statement of the evidence.

18

## III. *Alleged Instructional Error*

The trial court instructed the jury with CALCRIM No. 361, which provided the following: "If defendant, . . . Dixon, failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If defendant, . . . Dixon, failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

Dixon contends the trial court erred in instructing the jury with CALCRIM No. 361 because he did not fail to explain or deny any adverse evidence. Error in giving this instruction requires reversal only if it is reasonably probable a more favorable verdict would have resulted had the instruction not been given. (See *People v. Saddler* (1979) 24 Cal.3d 671, 683; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1471–1472 (*Lamer*).) We conclude that even if the instruction was improper, it was not prejudicial.

CALCRIM No. 361 informs the jury that the defendant's failure to explain or deny incriminating facts "may" be used to evaluate the defendant's testimony *if* the jury finds the defendant failed to explain or deny the evidence *and if* the defendant "could reasonably be expected to have done so based on what [he] knew . . . ." The instruction also states that it remains the jury's task to determine "the meaning and importance" of any omission in defendant's testimony. The trial court further instructed the jury that not all the instructions were necessarily applicable, and advised jurors to follow the instructions that applied to the

19

facts determined by them (CALCRIM No. 200).

Under these instructions, we must assume the jury disregarded CALCRIM No. 361 if there was no evidence that Dixon failed to explain or deny. Thus, Dixon suffered no prejudice from the giving of the instruction. (See *Lamer*, *supra*, 110 Cal.App.4th at p. 1472; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 139 [jury presumed to understand and follow instructions].) Because the instruction permits, but does not require, the jury to consider an inference under certain circumstances, courts "routinely" find an error in giving the instruction was harmless. (*Lamer*, at p. 1472.)

Dixon contends the error was prejudicial in this case because the instruction "encourage[d] [the jury] to distrust the credibility of [his] defense and his . . . testimony and to more favorably view the credibility of the prosecution's evidence." However, no reasonable juror would interpret the instruction to mean the court was suggesting the jury should distrust Dixon and favor the prosecution. This is especially true where, as here, the court informed the jury that it "*must impartially* compare and consider *all* the evidence that was received throughout the entire trial" (CALCRIM No. 220, italics added.) and it should not disregard testimony "because of prejudice or a desire to favor one side or the other" (CALCRIM No. 302).

Dixon also contends he would have received a more favorable result if the instruction was not given because Garcia's identification of him was questionable. We are not convinced. Although Garcia identified Gray as the carjacker with the gun at the preliminary hearing, he explained the mistake at trial. Garcia stated he was panicked, it was his first

20

time testifying and he did not have much time to look at the man he was asked to identify. Garcia realized his mistake and contacted the District Attorney's office after the preliminary hearing to inform them of the mistake. Notably, Garcia positively identified Dixon on the night of the crime and at trial. He stated there was no doubt in his mind that Dixon was the man who pulled a gun on him. There was also other significant identification evidence which connected Dixon to the crime. Specifically, when Dixon was detained, he was wearing clothing similar to that described by Garcia and Evans.

Based on the evidence, it is not reasonably probable that Dixon would have obtained a more favorable result if the trial court did not instruct the jury with CALCRIM No. 361.

### IV. *Cumulative Error*

The defendants argue the cumulative effect of the prosecutor's alleged misconduct combined with the trial court's alleged errors in excluding third party culpability evidence and instructing the jury with CALCRIM No. 361 warrant reversal.

We concluded the trial court did not abuse its discretion in excluding the proffered third party culpability evidence (*ante*, part I). We further concluded even if certain statements in the prosecutor's argument constituted misconduct, they were not prejudicial (*ante*, part II). Similarly, we found that even if the court erred by instructing the jury with CALCRIM No. 361, the error was not prejudicial (*ante,* part III). For the same reasons, we conclude that if the alleged prosecutorial misconduct and instructional error are viewed cumulatively, they are not unduly prejudicial and it is not reasonably probable that the defendants would have obtained a more favorable result had they not occurred. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Holt* (1984) 37 Cal.3d 436, 458.)

21

DISPOSITION

The judgments are affirmed.

McINTYRE, J.

WE CONCUR:

BENKE, Acting P. J.

O'ROURKE, J.